## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) |
| DIONNE VAN ZYL, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

I.     **INTRODUCTION**

1.     The Commission brings this action to enjoin Dionne Van Zyl ("Van Zyl") from violating the antifraud provisions of the federal securities laws.  Van Zyl, an investment adviser who served as a senior Elder in a church in the suburbs of Atlanta, Georgia, and used his position of trust to develop ongoing investment advisory relationships with dozens of congregants.

2.     Van Zyl defrauded his advisory clients primarily by failing to disclose to them hidden commissions and other compensation he received in connection

with investments he recommended.  Van Zyl's fraud took place between January 2013 and June 2019 and played out in at least three different contexts.

3.     First, beginning in 2013, Van Zyl recommended that 35 clients invest approximately $23.5 million in start-up companies that he owned and controlled, all of which ended in significant financial losses for his clients.  In connection with these failed investments, Van Zyl collected approximately $1.3 million of undisclosed fees, commissions, and other compensation.

4.     Second, beginning in 2015, Van Zyl engaged in risky high-frequency forex trading with his clients' funds, resulting in large losses, but generating approximately $1.6 million of undisclosed commissions.

5.     Third, beginning in 2017, Van Zyl recommended that his clients invest approximately $3.5 million in an unregistered investment company for which he served as the fund manager, and, after misrepresenting the use and safety of the pooled funds, he directed a majority of the funds into a business he knew was failing and into forex trading, for which he took undisclosed commissions.

6.     As a result of the conduct alleged in this Complaint, Van Zyl violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; and Sections 206(1), 206(2),

and 206(4) and Rule 206(4)-8 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4), and 17 C.F.R. § 275.206(4)-8. Unless restrained and enjoined, Van Zyl is reasonably likely to continue to violate the federal securities laws.

7.      The Commission therefore respectfully requests the Court enter: (i) permanent injunctions restraining and enjoining Van Zyl from violating the federal securities laws, and from directly or indirectly participating in the issuance, purchase, offer, or sale of any security (provided, however, that such injunction shall not prevent Van Zyl from purchasing or selling securities listed on a national securities exchange for his own personal accounts); (ii) an order directing Van Zyl to pay disgorgement with prejudgment interest; and (iii) an order directing Van Zyl to pay a civil money penalty.

## II.   DEFENDANT AND RELATED ENTITIES UNDER HIS CONTROL

8.      **Van Zyl**, age 56, is a resident of Alpharetta, Georgia, and served as a senior Elder in a suburban Atlanta church.  Van Zyl has never been associated with any Commission-registered investment adviser or broker-dealer.

9.      **OnCue Technologies, LLC ("OnCue")** is a Delaware limited liability company previously owned and controlled by Van Zyl with its principal

place of business in Duluth, Georgia.  Currently, OnCue is owned and controlled by several investors, and has been renamed Sellr.

10.     **Sanctuary Capital, LLC ("Sanctuary")** is a Wyoming limited liability  company with no principal place of business on record.  Van Zyl was the manager of Sanctuary, which served as the platform for a foreign exchange trading algorithm.

11.     **Niche Market Investments, LP ("Niche")** is a Wyoming limited partnership and an unregistered investment company with its principal place of business in Atlanta, Georgia.  Van Zyl was the Chief Executive Officer of Niche.

12.     **Doron Capital, LLC ("Doron")** is a Georgia limited liability company with its principal place of business in Johns Creek, Georgia.  Van Zyl is the registered agent and organizer of Doron.

## III.    <u>JURISDICTION AND VENUE</u>

13.     The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); Sections 21(d) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa(a); and Sections 209 and 214 of the Advisers Act, 15 U.S.C. §§ 80b-9 and 80b-14.

14.     The Court has personal jurisdiction over Van Zyl, and venue is proper in this District, because, among other things: (i) Van Zyl solicited investment advisory clients and offered or sold securities to investors in this District; (ii) Van Zyl is a resident of this District; and (iii) some or all of the acts and transactions in which Van Zyl engaged and that constitute violations of the federal securities laws occurred in this District.

15.     In connection with the conduct alleged in this Complaint, Van Zyl, directly and indirectly, singly or in concert with others, has made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange.

## IV.   FACTUAL ALLEGATIONS

### A.   Van Zyl Holds Himself Out as an Investment Adviser and Grooms Church Congregants for Investments in His Businesses.

16.     Since at least 2012, Van Zyl used his position as a senior Elder at a suburban Atlanta church to develop investment advisory relationships with dozens of individuals who shared his religious beliefs.

17.     Van Zyl held himself out as an investment adviser, providing church congregants financial advice and information concerning clients' retirement portfolios.

18.    Van Zyl's clients from his church were typically wealthy, but lacked financial sophistication.

19.    Van Zyl told clients that he had a background in finance and private equity, and typically recommended that they sell more conservative securities holdings to invest with his various start-up companies under a strategy he called "capital preservation."

20.    He also assisted multiple clients in establishing self-directed individual retirement accounts as vehicles to invest funds with him.

21.    Van Zyl did not clearly explain how he was to be compensated for his advice.  Van Zyl told them only that he could take certain "advisory" and "consulting" fees.

**B.    Van Zyl Collects at Least $1.3 Million in Undisclosed Compensation from Investments He Directed into Start-Ups He Controlled.**

22.    Through the relationship of trust fostered by their shared beliefs and place of worship, Van Zyl repeatedly solicited his clients to invest in a variety of his private equity ventures and start-up businesses through Doron.

23.    Van Zyl typically funneled funds invested with Doron into OnCue, a point-of-sale technology company, and Sanctuary, a software development

company that developed forex trading algorithms and related trading-platform technologies.

24.     Van Zyl owned and controlled each of these entities.

25.     Between 2013 and 2019, approximately 35 clients invested a total of approximately $23.5 million in these and other companies owned and controlled by Van Zyl.

26.     Van Zyl employed faith-based investment pitches and high-pressure sales tactics, such as stating the opportunities were only open for a limited period of time, or for a limited number of investors.

27.     Van Zyl always pitched the investments as promising capital preservation.

28.     Van Zyl's clients trusted him to make investment decisions on their behalf.  They did not understand the specific details of their investments.

29.     For clients who invested, Van Zyl would issue promissory notes to the client on behalf of one of his various companies.  Van Zyl also provided clients with an associated generic offering memorandum or executive summary.

30.     When the promissory notes came due, Van Zyl typically advised clients to extend the repayment periods of the promissory notes, and most investors did do.

31.     Ultimately, Doron, OnCue and Sanctuary failed to generate any revenues and Van Zyl advised clients to convert their promissory notes from those entities into equity interests in one of his other enterprises.

32.     Most investors did so, and there are no remaining investor funds in Doron, OnCue or Sanctuary.

33.     Between 2013 and 2019, Van Zyl took at least $1.3 million in undisclosed fees, commissions, and other compensation from investors in Doron, OnCue, Sanctuary and other companies owned and controlled by Van Zyl.

**C.      Van Zyl Defrauds Clients Through Forex Trading.**

34.     Beginning in 2015, Van Zyl began recommending that new and existing clients open forex trading accounts that he would manage using his Sanctuary trading platform.

35.     In connection with the forex trading recommendations, Van Zyl made several representations to his clients.

36.     For example, on multiple occasions, Van Zyl described the trading platform to his clients as a capital preservation tool.

37.     Van Zyl told his clients that only 15 percent of their capital would be at risk at any given time, and that the remaining 85 percent was "secure."

38.     Van Zyl used back-tested data to pitch the profitability and low-risk nature of his trading strategy, and told clients it would avoid losses and capitalize on gains.

39.     Van Zyl encouraged his clients to withdraw funds from their retirement accounts to invest in the trading platform, stating that the algorithm worked better with more funds invested.

40.     From June 2015 through December 2018, at least nine of Van Zyl's clients opened such forex trading accounts and invested approximately $4.1 million in principal.

41.     All of these clients signed forms giving Van Zyl full discretionary trading authority over their accounts.

42.     In terms of associated fees, each client signed a form drafted at Van Zyl's direction, but appearing on a broker's letterhead, stating that the trading fees were, in the aggregate, $7.50 per each buy and sell of $100,000 of involved foreign currencies.

43.     Van Zyl did not disclose, however, that Van Zyl himself retained these trading fees.

44.     In total, Van Zyl collected $1.6 million in undisclosed commissions on trades he made for clients using the Sanctuary platform, while his clients lost nearly all their principal.

**D.     Van Zyl Defrauds the Niche Investment Fund and Its Investors.**

45.     Beginning in 2017, Van Zyl offered his clients an additional avenue to participate in forex trading and his other ventures through Niche, an unregistered investment company (i.e., a fund) formed and controlled by Van Zyl.

46.     Van Zyl served as the Niche fund's investment adviser.

47.     Van Zyl misrepresented the safety of investments in Niche.  For example, Van Zyl gave clients a written offering document that the principal of the investment was "protected even if 70% of the investments fail."

48.     In reality, however, at least two investments of approximately $500,000 resulted in refunds to clients of only about 15-16% of the original investment – $78,000 in one instance and $79,000 in another.

49.     Van Zyl also made false representations about the fund's objectives and his use of money invested in the fund.  For example, Van Zyl stated that the goal of Niche was "principal resilience:  The protection of principal is the primary and overarching objective of all our investments."

50.    In fact, however, once funds were invested in Niche, Van Zyl wired money to various accounts he owned and controlled, and also used some Niche funds to pay back other clients who had lost money in other Van Zyl investments.

51.    At least $3.5 million in client funds flowed into the Niche account, and at least 3 clients invested funds from self-directed retirement accounts, where they were then co-mingled with assets invested by other clients.

52.    From those funds, Van Zyl directed a majority of the money into a business he knew was failing and into forex trading, for which he took undisclosed commissions.

## COUNT I

## Fraud in Violation of Section 17(a)(1) of the Securities Act

53.    The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

54.    Van Zyl, in the offer or sale of any securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed a device, scheme or artifice to defraud.

55.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Fraud in Violation of Section 17(a)(2) of the Securities Act

56.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

57.     Van Zyl, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

58.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT III

### Fraud in Violation of Section 17(a)(3) of the Securities Act

59.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

60.     Van Zyl, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly, recklessly or negligently engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit upon the purchaser of such securities.

61.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT IV

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

62.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

63.     Van Zyl directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly

employed a device, scheme or artifice to defraud, in connection with the purchase or sale of securities.

64.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT V

## Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

65.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint

66.     Van Zyl directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in connection with the purchase or sale of securities.

67.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## COUNT VI

## Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

68.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

69.     Van Zyl directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly engaged in an act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

70.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT VII

## Investment Adviser Fraud in Violation of Section 206(1) of the Advisers Act

71.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

72.     Van Zyl acted as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).  For compensation, he

engaged in the business of advising clients as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

73.     By engaging in the conduct described in this Complaint, Van Zyl, by use of the mails or the means or instrumentalities of interstate commerce, directly or indirectly, knowingly or recklessly employed a device, scheme, or artifice to defraud a client or prospective client.

74.     By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## COUNT VIII

## Investment Adviser Fraud in Violation of Section 206(2) of the Advisers Act

75.     The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

76.     Van Zyl acted as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).  For compensation, he engaged in the business of advising clients as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

77.     By engaging in the conduct described in this Complaint, Van Zyl, by use of the mails or the means or instrumentalities of interstate commerce, directly

or indirectly, knowingly, recklessly or negligently engaged in a transaction, practice, or a course of business which operated as a fraud or deceit upon a client or prospective client.

78.    By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## COUNT IX

### Investment Adviser Fraud in Violation of Section 206(4) and Rule 206(4)-8 of the Advisers Act

79.    The Commission repeats and realleges Paragraphs 1 through 52 of its Complaint.

80.    Van Zyl acted as an investment adviser to the Niche Fund within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). For compensation, he engaged in the business of advising the Niche Fund as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

81.    The Niche Fund was a "pooled investment vehicle" within the meaning of Rule 206(4)-8(b) of the Advisers Act, 17 C.F.R. § 275.206(4)-8(b).

82.    By engaging in the conduct described in this Complaint, Van Zyl, by use of the mails or the means or instrumentalities of interstate commerce, directly

or indirectly, knowingly, recklessly or negligently made an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the Niche Fund; or otherwise engaged in an act, practice or a course of business that was fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the Niche Fund.

83.    By reason of the foregoing, Van Zyl violated, and, unless enjoined, is reasonably likely to continue to violate, Section 206(4) and Rule 206(4)-8 of the Advisers Act, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Van Zyl committed the violations charged, and enter judgment:

## I.

## Permanent Injunction

Permanently restraining and enjoining Van Zyl, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint.

## II.

### Disgorgement

Ordering Van Zyl to disgorge, with prejudgment interest, all ill-gotten gains received as a result of the acts or courses of conduct alleged in this Complaint.

## III.

### Penalty

Ordering Van Zyl to pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d); and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## IV.

### Further Relief

Granting such other and further relief as the Court determines to be necessary and appropriate.

## V.

### Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Van Zyl in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable

application or motion by the Commission for additional relief within the

jurisdiction of this Court.

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims so triable.

DATED:  February 25, 2020

Respectfully submitted,

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

*/s/W. Shawn Murnahan*
W. Shawn Murnahan
Senior Trial Counsel
Georgia Bar No. 529940
murnahanw@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7669
Facsimile: (703) 813-9364